**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **SHANE LEE SULLIVAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:16-00083** |
| | ) | **Judge Trauger/Brown** |
| **NANCY BERRYHILL, ACTING** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable Aleta A Trauger, United States District Judge.**

## REPORT AND RECOMMENDATION

    This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the

final decision of the Social Security Administration (SSA) through its Commissioner denying

plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security

Act (the Act), 42 U.S.C. §§ 416(I) and 423(d), and Supplemental Security Income (SSI) under Title

XVI of the Act, 42 U.S.C. §§ 1381 *et seq*.  For the reasons explained below, the undersigned

**RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 15) be

**DENIED** and the Commissioner's decision **AFFIRMED**.

## I.  PROCEDURAL HISTORY[1]

    Plaintiff filed applications for DIB and SSI on January 30, 2013, alleging a disability onset

date of January 24, 2013 in both instances.  Plaintiff alleged disability due to injuries resulting from

a single-car accident on January 24, 2013, *i.e.*, neck pain, right hip fracture, knee pain, and possible

---

[1]  The procedural history below is adopted from the jurisdiction and procedural history section of the ALJ's
decision (Doc. 10, p. 23), unless indicated otherwise.  References to page numbers in the administrative record are to
the page numbers that appear in bold in the lower right corner of each page.

nerve issues. (Doc. 10, pp. 131, 141, 144, 216) Both claims were denied initially on May 24, 2013, and upon reconsideration on September 18, 2013.

Plaintiff requested a hearing before an ALJ on October 1, 2013. A hearing was held before ALJ George Evans on June 24, 2015. Plaintiff was represented at the hearing by attorney John Windle. Vocational expert (VE) Jane Hall testified at the hearing.

The ALJ entered an unfavorable decision on August 12, 2015 (Doc. 10, pp. 20-36), after which plaintiff filed a request with the Appeals Council on September 9, 2015 to review the ALJ's decision (Doc. 10, 17-19). The Appeals Council denied plaintiff's request on August 10, 2016. (Doc. 10, pp. 1-7)

Plaintiff brought this action through counsel on October 10, 2016 (Doc. 1), following which he filed a motion for judgment on the administrative record on April 24, 2017 (Doc. 15). The Commissioner responded in opposition May 25, 2017. (Doc. 21) Plaintiff did not reply. This matter is now properly before the court.

## II. EVIDENCE[2]

### A. Documentary Evidence

Plaintiff was airlifted to the Vanderbilt University Medical Center on January 24, 2013. He was provided emergency medical treatment, hospitalized briefly, discharged on January 26, 2013, and provided follow-on care through July 25, 2013. (Doc. 10, pp. 325-46, 350-52)

B. Kathryn Galbraith, Ph.D., evaluated plaintiff on September 9, 2013 on referral from the Tennessee Disability Determination Services (DDS). (Doc. 10, pp. 368-72) Dr. Galbraith summarized her evaluation as follows:

---

[2] The medical evidence of record and proceedings at the hearing are discussed below to the extent that they are relevant to plaintiff's claims of error. The remainder of the medical evidence of record and proceedings at the hearing is incorporated herein by reference.

Mr. Sullivan appears to fall into the borderline range of intellectual functioning, though no formal intellectual testing was done at this time. He showed evidence of moderate impairment in his short term memory function. He showed evidence of moderate impairment in his concentration abilities. He showed evidence of moderate impairment in his long term and remote memory functioning.

His current psychiatric state was depressed. He shows evidence of a moderate impairment in his social relating. He appears to be moderately impaired in his ability to adapt to change. He appears able to follow instructions, both written and spoken. He appears to have had a stable work history. He appears unable to handle finances.

(Doc. 10, pp. 371-72) The evaluation was based on a clinical interview and mental status examination. Dr. Galbraith diagnosed plaintiff with adjustment disorder and depressed mood (Axis I), and borderline intellectual functioning (Axis II). (Doc. 10, p. 372) The only record before Dr. Galbraith at the time of the evaluation was an adult function report completed and signed by Beverly Sullivan – plaintiff's mother – on July 19, 2013.[3,4] (Doc. 10, pp. 252-59, 368)

Plaintiff presented for a physical assessment on September 10, 2013. (Doc. 10, p. 377) Thereafter, on September 22, 2013, Dr. Michael Cox, M.D., completed a form captioned "MEDICAL ASSESSMENT TO DO WORK-RELATED ACTIVITIES (PHYSICAL)" – hereinafter Dr. Cox's medical source statement (MSS) – based on the "09/10/13" clinical record.[5] Dr. Cox

---

[3] The ALJ characterized this report as a "third Party Function Report," but he did not assign any weight to it because it appeared that plaintiff's mother completed the report "for and with the help of the claimant." (Doc. 10, p. 30)

[4] The adult function report completed by plaintiff's mother indicated that plaintiff experienced "some" memory problems, that it was "hard" for him to complete tasks, that he had "some" difficulty understanding, and that he had limitations in his ability to follow instructions. (Doc. 10, p. 257) The adult function report completed by plaintiff 4 ½ months earlier on March 2, 2013 indicated that plaintiff only had difficulty completing tasks and getting along with others, but that those limitations were due to his physical injuries. (Doc. 10, p. 227)

[5] The clinical record, with the machine-printed initials "MTC/mjs" appearing at the bottom followed by the handwritten initials "C[sic]x," noted that plaintiff was "in the process of applying for disability and comes in today for an evaluation," with instructions to "[f]ill out medical assessment form and forward to John Mark Windle," plaintiff's attorney. (Doc. 10, p. 377) (It appears from studying the record that "C[sic]x" are Dr. Cox's initials.) It cannot be determined from the record why plaintiff presented for examination, i.e., whether DDS ordered the examination or

3

opined that plaintiff could: 1) lift 20lbs. occasionally in an 8-hour day; 2) lift 5 lbs. frequently in an 8-hour day; 3) stand, walk or sit a total of 2 hrs. in an 8-hour day, 30 mins. without interruption; 4) never climb, balance, stoop, crouch, kneel, or crawl; 5) not reach, bend, push or pull for no more than 2 hrs. in an 8-hour day. (Doc. 10, pp. 374-75)(bold omitted)

On September 17, 2013, Dr. Fawz Schoup, Ph.D., conducted a psychological assessment of plaintiff's record, and completed a mental residual functional capacity (RFC) assessment, upon reconsideration. (Doc. 10, pp. 101-02, 105-06) Dr. Schoup, who considered Dr. Galbraith's September 2013 report, noted that there was "no evidence of cognitive impairments." (Doc. 10, p. 101) Dr. Schoup also determined that plaintiff had the mental RFC to: 1) "understand and remember . . . low level detailed tasks"; 2) "maintain [concentration, performance, and persistence] for low level detailed tasks"; 3) "interact with the public on [an] occasional basis," but was not otherwise significantly limited in his social interaction; 4) "adapt to gradual change." (Doc. 10, pp. 120-21)

Plaintiff was evaluated by Roy Bilbrey, Ph.D., on June 28, 2015 following the administrative hearing. (Doc. 10, pp. 390-98) Plaintiff requested that Dr. Bilbrey perform "a psychological evaluation for the purpose of providing the information to his attorney to be included in his application for social security benefits . . . [and] requested that all results of the evaluation be forwarded to his attorney, Mr. John Mark Windle." (Doc. 10, p. 390) Dr. Bilbrey wrote the following relevant entries in his report based on clinical interview, mental status examination, and Wechsler Adult Intelligence Scale (WAIS)-IV and Wide Range Achievement Test-3 testing:

> Mr. Sullivan was alert and oriented in all spheres. His speech was spontaneous and he was relevant and coherent. . . . His affect appeared to be within normal limits . . . . He denies the presence of

---

whether plaintiff's attorney requested it. Dr. Cox is not identified as a physician in the adult disability reports (Doc. 10, pp. 219, 247-49, 267-68), nor are there any treatment records in the medical record of evidence that establish a treating relationship between Dr. Cox and plaintiff.

any hallucinations, delusions, or other deviant mentations or thought disorders. . . . His immediate memory is adequate . . . . His memory for recent events is adequate . . . . His memory for remote events appears to be adequate . . . . He did not appear to have any difficulty concentrating. His judgment and reasoning abilities appear to be adequate . . . . He is capable of thinking in abstract terms . . . . His stream of thought is adequate . . . .

. . .

Mr. Sullivan . . . did not appear to have any difficulty concentrating throughout the process.

. . .

Mr. Sullivan is capable of relating to others and interacting and communicating effectively with them.

. . .

The scores on the Wechsler Adult Intelligence Scale-IV do not accurately represent Mr. Sullivan's level of intellectual functioning. The scores predict academic achievement, and Mr. Sullivan appears to have learning disabilities in the areas of reading and mathematics computation. His Processing Speed was also considerably low, as was his Verbal Comprehension. Word knowledge and general factual knowledge would require good reading ability. He is definitely not mentally deficient, and his true level of intellectual functioning is estimated to be in the Low Average range. . . .

(Doc. 10, pp. 391-92) Dr. Bilbrey diagnosed plaintiff with a reading and mathematics disorder, but rendered no diagnosis as to personality disorder or mental retardation (Axis II). (Doc. 10, p. 393)

Dr Brent Staton[6] completed a physical medical assessment on July 9, 2015, hereinafter Dr. Staton's MSS. Dr. Staton opined that plaintiff: 1) could lift 15 lbs. occasionally in an 8-hour day; 2) could lift 5 lbs. frequently in an 8-hour day; 3) could stand or walk a total of 2 hrs. in an 8-hour day, 30 mins. without interruption; 4) could sit 2-3 hrs. in an 8-hour day, 30 mins. without

---

[6] Dr. Staton's name is spelled "Stanton" at various places in the record. The correct spelling of his name appears to be "Staton."

interruption; 5) could  never climb, balance, stoop, crouch, kneel, or crawl; 6) was limited in his ability to reach, bend, push or pull.  (Doc. 10, pp. 380-82)

### B.  The Administrative Hearing

The ALJ established the following upon initial questioning of plaintiff: 1) plaintiff graduated from high school with a special education diploma (Doc. 10, pp. 48-49); 2) he was unable to read, write, or spell well (Doc. 10, pp. 48-49); 3) but for his physical limitations, his depression alone would not prevent him from working (Doc. 10, p. 51).

The colloquy below transpired between the ALJ and counsel pertaining to records of intelligence testing:

> ALJ: Do we have any IQ testing, Mr. Windle, in the record?
>
> ATTY: No, sir, Galbr[ai]th . . . did no formal testing, but f[ound] that borderline . . . .
>
> ALJ: But no school records that you could obtain . . . . I think I looked through them, but I couldn't find any IQ scores. Any IQ scores?
>
> ATTY: No . . . I'm sorry, your honor, there's no IQ scores. It['s] . . . just reflective of his Department of Education high school certificate, which he says he got partial requirements. . . . Everything's applied math and agriculture.  He basically took special ed classes . . . .
>
> ALJ: You'd think there'd have been some testing along the way.
>
> ATTY: Yeah, your honor, I would think so.  That's . . . what they sent me.  But I can go back and check that again. . . .  At that period of time, there's usually . . . an intelligence scale.

(Doc. 10, pp. 54-55)  Plaintiff's attorney adduced the following upon subsequent questioning of plaintiff: 1) he could read "some words" in a newspaper, but not "big words" (Doc. 10, p. 58); 2) his

ability to concentrate varied (Doc. 10, p. 60); 3) his short term memory was limited (Doc. 10, p. 60).

The ALJ asked the VE provide an assessment of plaintiff's work history at the conclusion of counsel's examination, to which the VE responded: "he was a lineman for various utility contractors. That's a heavy job. It is skilled . . . ." (Doc. 10, p. 64) The ALJ then asked the VE the following single hypothetical question:

> In hypothetical number one we have unskilled, light exertion, the ability to change positions at intervals of 30 minutes, no pushing with the right lower extremity, no more than one to two to three step instruction, and not dependent on reading ability. Are there jobs for such an individual in the national economy.

(Doc. 10, p. 64) The VE identified three jobs plaintiff could perform: cleaner, inspector/tester/sorter, and machine operator. (Doc. 10, p. 64)

Plaintiff's attorney cross examined the VE regarding the following single physical issue, but not as to any psychological issues:

> Q      . . . . I think I'm reading this right, your honor, can sit for a total of six hours out of an eight hour day and stand for a total of one hour. I think that would be seven hours and disqualify . . . any full time employment.
>
> A      No walking restrictions or is that supposed to be for standing and walking one hour?
>
> Q      Standing and walk for one hour.
>
> A      Oh, stand and walk for one hour.
>
> Q      And together.
>
> A      Certainly that would be a seven hour workday and, therefore, this individual could not work.

(Doc. 10, p. 65)

## III.  ANALYSIS

### A.  The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014).  While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile.  *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).  The ALJ determined that plaintiff had the RFC "to perform light unskilled work except that he needs the ability to change positions at intervals of 30 minutes; no pushing with the right lower extremity; no more than 1, 2 or 3-step instructions, and work that is not dependent on reading ability.  (Doc. 10, pp. 27-28)(bold omitted)

### B.  Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards.  42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374.  Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708,

722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion. *Gayheart*, 710 F.3d at 374.

## C. Claims of Error

### 1. Whether the ALJ Erred in Finding that Plaintiff Did Not Have an Impairment or Combination of Impairments that Met or Medically Equaled Listing 12.05C[7] (Doc. 16, pp. 12-16 of 26)

Plaintiff's first claim of error is that the ALJ erred in determining that he did not meet the requirements of listing 12.05C, intellectual disability. Plaintiff argues that "the ALJ erred in failing to find that [his] mental impairment alone or in the alternative in combination with his right femur fracture, neck disorder and learning met the criteria for an appropriate Listing." (Doc. 16, p. 13 of 26) Plaintiff asserts further that Dr. Bilbrey's examination, discussed above at pp. 4-5, was "sufficient to satisfy Listing 12.05(C)" because he "has an IQ of 63," "learning disabilities in the areas of reading and math," that he has "suffered from these conditions since a child," and that he had "additional and significant physical conditions from his neck, hip and leg injury . . . ." (Doc. 16, pp. 13-14 of 26) Plaintiff also argues that Dr. Galbraith's report, discussed above at pp. 2-3 supports his claim that he satisfies requirement under listing 12.05C.

To be found disabled upon a listed impairment, "the claimant must exhibit all the elements of the listing." *Robertson v. Comm's of Soc. Sec.*, 513 Fed.Appx. 439, 440 (6th Cir. 2013)(quoting *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Listing 12.05C has two mandatory parts. The first part is referred to as the "diagnostic definition." The "diagnostic definition" itself has three parts: significantly sub-average general intellectual functioning, significant deficits in current adaptive functioning, **and** evidence that the disorder began prior to age 22. 20 C.F.R. Pt.

---

[7] The parties and case law refer to subsection C of listing 12.05 using two different conventions: 12.05(C) and 12.05C. Although 12.05C is correct, both refer to the "intellectual disability" of listing 12.05.

404, Subpt. P Appx. 1, § 12.05; *see Hayes v. Comm'r of Soc. Sec.*, 357 Fed.Appx. 672, 674-75 (6th Cir. 2009). The second part is referred to as the "severity criteria." There are two parts to the severity criteria: a valid verbal, performance, or full-scale IQ of 60 through 70, **and** a physical or mental impairment imposing an additional and significant work-related limitation or function. 20 C.F.R. Pt. 404, Subpt. P Appx. 1, § 12.05(C); *see Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed.Appx. 426, 432 (6th Cir. 2014); *see also Joyce v. Comm'r of soc. Sec.*, 662 Fed.Appx. 430, 433 (6th Cir. 2016). The law is well established in the Sixth Circuit that listing 12.05C requires the claimant to satisfy both the "diagnostic definition" and the "severity criteria." *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); *see also Hayes*, 357 Fed.Appx. at 675 (citing *Foster*); *West v. Comm'r of Soc. Sec.*, 240 Fed.Appx. 692, 697-98 (6th Cir. 2007)(citing *Foster*). In other words, if plaintiff fails to satisfy all of the parts of "diagnostic definition" **and** all of the parts the "severity criteria," then he fails to satisfy listing 12.05C. *See Foster*, 279 Fed.Appx. At 354-55.

The record shows that the ALJ considered whether plaintiff met the requirements under listing 12.05C in his step three analysis. The ALJ wrote the following in determining that plaintiff did not meet the requirements of listing 12.05C:

> IQ testing conducted during Dr. Bilbrey's exam showed the claimant's full scale IQ at 63. . . . Dr. Bilbrey did not consider the score valid and felt the claimant, given his work history and presentation, functioned more in the low average range of intellectual functioning. This is consistent with the consultative psychological examiner [Dr. Galbraith] who felt the claimant functioned at least in the borderline range of intellectual functioning. Finally, the 'paragraph C' criteria of listing 12.05 are not met because the claimant does not have a valid, verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

(Doc. 10, p. 27) As shown above, the ALJ determined that plaintiff failed in to satisfy the requirements for disability under § 12.05C because he failed to satisfy the IQ requirement of the

"severity criteria."

The ALJ's determination that plaintiff failed to satisfy the "severity criteria" of listing 12.05C is supported by substantial evidence on the record. First, the excerpt from the ALJ's decision quoted on the preceding page reflects accurately the relevant parts of Dr. Bilbrey's report, quoted above at pp. 4-5. Although the ALJ did not mention it, Dr. Bilbrey also did not render an Axis II diagnosis. Second, there is nothing in Dr. Galbraith's report that would cause a reasonable ALJ to give her report greater weight than Dr. Bilbrey's. As noted above at p. 3, Dr. Galbraith reported that plaintiff "appear[ed] to fall into the borderline range of intellectual functioning," an opinion that tracks Dr. Bilbrey's, and that "no formal intellectual testing was done . . . ." Moreover, both Drs. Bilbrey and Galbraith are examining, non-treating sources and, as such, absent anything to distinguish one report from the other, both reports are – theoretically – entitled to equal weight. To that end, Dr. Bilbrey's report is entitled to more weight because of Dr. Bilbrey's greater reliance on formal testing, and the fact that it was a year and nine-plus months nearer in time to when the ALJ wrote his decision than Dr. Galbraith's report. Finally, as counsel admitted at the hearing, there are no other records pertaining to plaintiff's IQ upon which the ALJ might have reached a different conclusion.

Because plaintiff did not satisfy the IQ requirement of "severity criteria," it is not necessary to address whether plaintiff satisfied the "diagnostic definition." Plaintiff's first claim of error is without merit.

## 2. Whether the ALJ Erred in Relying on the
## Hypothetical Posed to the VE
## (Doc. 16, pp. 16-18 of 26)

Plaintiff asserts two arguments in support of his second claim of error: 1) the ALJ did not include his mental impairments in the hypothetical posed to the VE; 2) the VE testified that, if plaintiff "could only stand or walk for one hour during a seven hour workday," then plaintiff "could

not work."  The hypothetical at issue is quoted above at p. 7.

It is "well established an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Carrelli v. Comm'r of Soc. Sec.*, 390 Fed.Appx. 429, 438 (6th Cir. 2010)(quoting *Casey v. Sec'y of Health and Hum. Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  "[A]lthough a hypothetical question need not incorporate a listing of the claimant's medical conditions, the VE's testimony, to be reliable, must take into account the claimant's functional limitations, *i.e.*, what he or she 'can and cannot do.'" *Infantado v. Astrue*, 263 Fed.Appx. 469, 476 (6th Cir. 2008)(citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 632-33 (6th Cir. 2004)); *see Foster*, 279 F.3d at 356; *Varley v. Sec'y of Health and Human Serv's*, 820 F.2d 777, 779 (6th Cir. 1987).  That said, the ALJ is not required to accept claimant's subjective complaints, and "can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate." *See Jones v. Comm's of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Plaintiff asserts the following in the context of the ALJ's alleged failure to include his mental limitations in the hypothetical: 1) "the ALJ did not properly fashion Plaintiff's RFC based on the medical record in its entirety"; 2) "the ALJ did not consider Plaintiff's mental impairments with his physical impairments"; 3) "the ALJ did not take into consideration Plaintiff's mental impairments . . . all of which the record clearly shows he suffers from"; 4) "the ALJ should have referenced Plaintiff's mental condition in his hypothetical . . . ."; 5) the ALJ's "failure" to include plaintiff's mental impairments in the hypothetical "was not . . . 'harmless error.'" (Doc. 16, p. 17 or 26)

Although plaintiff asserts five times that the ALJ erred in not including his alleged mental impairments in the hypothetical, he does not provide any factual allegations in support of his argument.  More particularly, plaintiff fails to specify which of his alleged mental impairments the

ALJ should have included, the evidence that supported including those limitations in the hypothetical, and why including those limitations in the hypothetical would have made a difference in the VE's testimony and, therefore, the outcome of his claim for benefits. In short, plaintiff's first argument is nothing more than a naked allegation and, as such, it is conclusory.

The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf"). Consequently, plaintiff's first argument is waived. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Plaintiff's second argument in support of his second claim of error is quoted below in its entirety:

> Plaintiff's attorney asked the VE that if the claimant could only stand or walk for one hour during a seven hour workday would work be available. The VE clearly stated that in such a circumstance a claimant 'could not work.' . . . . The ALJ did not even address this testimony in his opinion even though Plaintiff would fall under such a hypothetical.

(Co. 16, p. 18 of 26) Counsel cross-examination of the VE on this issue is quoted above at p. 7.

Taking the argument above with the cross-examination at p. 7, it is apparent that plaintiff's theory of relief here is that the ALJ's hypothetical limits him to a 7-hour workday; therefore, he is "disqualif[ied] from any full time employment." Although not mentioned in the hypothetical, or in the ALJ's decision, the law is well established that most jobs include a morning break, a lunch

period, and an afternoon break at approximately two hour intervals. *See e.g, Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 730 (6th Cir. 2013)(citing SSR 96-9p, 1996 WL 362208 (July 12, 2996)). Since plaintiff does not challenge whether he can perform seven hours of work related activities in an 8-hour workday, then he is not disqualified from full time employment due to the breaks that are in addition thereto.[8] Accordingly, plaintiff's second argument is without merit.

For the reasons explained above, plaintiff's first argument is waived in part and without merit in part.

### 3. Whether the ALJ Erred in His RFC Determination (Doc. 16, pp. 18-25 of 26)

Plaintiff asserts that "the ALJ erred by accepting and giving great weight to the VE rather than his numerous treating physicians who gave him restrictions."[9] (Doc. 16, p. 18 of 26) Plaintiff asserts further that the ALJ erred in "discount[ing] several of Plaintiff's treating physicians based upon erroneous conclusions in direct oppositions to the clear record." (Doc. 16, p. 18 of 26) Finally, plaintiff asserts that the ALJ did not provide "good reasons" for discounting the opinions of the medical sources discussed below. (Doc. 16, pp. 20-26 of 26)

Plaintiff's RFC is an assessment of "the most he can do despite his limitations." 20 C.F.R. § 404.1545(a)(1). In making this determination, the ALJ must consider all relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8P, 1996 WL 374184 at * 5 (July 2, 1996). This evidence includes medical records, opinions of treating physicians, and the claimant's own

---

[8] Seven hours of work related activities + breaks = 8-hour workday.

[9] Counsel plays fast and loose throughout her memorandum with the terminology "treating physician" and "good cause." As discussed below, none of the medical sources whom counsel characterizes as "treating physicians" is a "treating physician." Consequently, the ALJ was not required to give "good cause" for the weight he gave to their opinions.

description of his limitations.  20 C.F.R. § 404.1545(a)(3).  "[T]he ALJ is not required to simply accept the [opinion] of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence." *Griffith v. Comm'r of Soc. Sec.*, 582 Fed.Appx. 555, 564 (6ᵗʰ Cir. 2014)(internal citations omitted). "The ALJ 'is required to incorporate only those limitations [he] accept[s] as credible'" into the RFC. *Myatt v. Comm's of Soc. Sec.*, 251 Fed.Appx. 332, 336 (6ᵗʰ Cir. 2007)(citing *Casey*, 987 F.2d at 1235).

Plaintiff's first argument in support of his third claim of error is that the ALJ erred in discounting Dr. Cox's MSS.  (Doc. 16, pp. 20-22 of 26)  The ALJ's discussion of Dr. Cox's MSS is quoted below:

> Dr. Cox completed a medical source statement placing the claimant at sitting/standing/walking 2 hours in an 8-hour day with no postural activities along with some additional restrictions. . . .  The undersigned finds that the medical evidence of record does not support such severe restrictions like no postural activities.  In addition, there are no treatment records from this physician so he is not a treating physician, and it is unclear whether he examined the claimant.  There is no examination report describing any tests such as range of motion testing that Dr. Cox administered to the claimant.  Thus, the undersigned gives this opinion little weight.

(Doc. 10, p. 29)  Plaintiff argues only that "the above statement by the ALJ is patently false [and] is  erroneous."  (Doc. 16, p. 20 of 26)

The first question is whether the ALJ erred in determining that Dr. Cox was not a treating physician.  Title 20 C.F.R. § 404.1502 defines "treating source" as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see,

15

> or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical conditions(s). We may consider an acceptable medical source who has treated or evaluated you only a few times . . . to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). . . .

Apart from the clinical record dated "09/10/13" upon which Dr. Cox's MSS is based (Doc. 10, p. 377), and as noted above at pp. 3-4 n. 5, there is nothing in the record to indicate that treating relationship existed between Dr. Cox and plaintiff. Additionally, the clinical record dated "09/10/13" notes that plaintiff "[wa]s in the process of applying for disability and comes in today for an evaluation," with instructions to "[f]ill out the medical assessment form and forward to John Mark Windle." (Doc. 10, p. 377) 20 C.F.R. § 404.1527 provides in relevant part that:

> We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

The foregoing constitutes substantial evidence that the ALJ was correct in determining that Dr. Cox was not a treating physician.

The next question is whether the ALJ erred when he wrote that it was "unclear whether [Dr. Cox] examined" plaintiff. As noted above at p. 3 n. 5, the printed initials "MTC/mjs," *i.e.*, machine generated, appear at the bottom of the "09/10/13" clinical record, and the handwritten annotation "C[*sic*]x"[10] appears to the right of and immediately adjacent to the printed initials "MTC/mjs." From these limited facts it is indeed "unclear whether [Dr. Cox] examined" plaintiff on "09/10/13," or whether he merely countersigned for those who did.

---

[10] A comparison of the handwritten notation "C[*sic*]X" with the signature on the physical medical assessment form (Doc. 10, p. 376) suggests that the handwritten notation is Dr. Cox's writing.

The next question is whether the ALJ erred in his statement that "[t]here is no examination report describing any tests such as range of motion testing . . . ." The record speaks for itself: there is no objective medical evidence of range of motion testing attached to the "09/10/13" clinical record or to Dr. Cox's MSS, only the subjective assessment of whomever examined plaintiff. Moreover, there is no other objective medical evidence in the record that would support the "severe restrictions" in Dr. Cox's MSS, including Dr. Staton's discredited MSS discussed below at p. 18.

Plaintiff argues next that the ALJ did not state with specificity why "Dr. Cox's opinions were not entitled to compelling weight and to provide **good reasons** for assigning them little weight." (Doc. 16, p. 21 of 26)(bold added) The ALJ is required to provide "good reasons" only for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). "[T]his requirement only applies to treating sources." *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)(citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). Because Dr. Cox examined plaintiff but did not treat him, the ALJ was not required to give "good reasons" for discounting his opinion. *See Stacey v. Comm'r of Soc. Sec.*, 451 Fed.Appx. 517, 519 (6th Cir. 2011). That said, "the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning." *Stacey*, 451 Fed.Appx. at 519. The ALJ's reasons above at p. 15 for giving Dr. Cox's opinion "little weight" are sufficient for those on subsequent review to follow his reasoning.

Plaintiff argues next that Dr. Cox's opinions were supported by Dr. Staton's MSS. (Doc. 16, pp. 21-22 of 26) Plaintiff also avers that the ALJ "did not conduct a sufficient review and analysis as to why little weight was given to th[is] opinion which is doubly important considering said findings were consistent with the record." (Doc. 16, pp. 23 of 26) The ALJ's treatment of Dr. Staton's opinion is quoted below in its entirety:

> Dr. Stanton [*sic*] completed a medical source statement with similar restrictions as that of Dr. Cox. . . . Again, undersigned finds that the medical evidence of record does not support such severe restrictions. In addition, there are no treatment records from this physician so he is not a treating physician. There is also no examination report describing any tests such as range of motion testing that Dr. Stanton [*sic*] administered to the claimant. Thus the undersigned gives this opinion little weight.

(Doc. 10, p. 30)

Dr. Staton is not a treating physician for the same reasons explained above at pp. 15-16 in the instance of Dr. Cox. There is no objective medical evidence accompanying Dr. Staton's MSS that describe any tests that Dr. Staton may have conducted, nor are there any other objective medical records that would support the restrictions assigned by Dr. Staton. It also is axiomatic that Dr. Staton's discredited MSS cannot support Dr. Cox's discredited MSS, and vice versa. Finally, for the reasons previously explained above at p. 17, the ALJ's explanation for giving little weight to Dr. Staton's MSS is adequate to permit subsequent reviewers to follow the ALJ's reasoning for giving little weight to Dr. Staton's MSS.

Plaintiff argues next that the ALJ "did not even address the lengthy findings of Dr. Bilbrey but rather once again discounts certain findings simply because Plaintiff was not actively seeking psychological treatment." (Doc. 16, pp. 22-23 of 26) Plaintiff's argument is quoted below in relevant part:

> Dr. Bilbrey is a treating physician of Plaintiff who conducted various mental and psychological tests. Therefore, Dr. Bilbrey's findings must be given great weight and deference. However, the ALJ decided to simply throw the most important finding out and that Plaintiff would need to miss three days of work for treatment each month. The ALJ provides no meaningful or legally sufficient explanation for excluding such an important finding. The ALJ states that the Plaintiff is not seeking mental health treatment nor has he ever. The ALJ appears to believe that because Plaintiff was not being treated for his mental health then he would not miss three days of work. However,

such a conclusion would only be valid [i]f Plaintiff intended to never seek treatment which the ALJ should not assume.

The ALJ wrote the following in his treatment of Dr. Bilbrey's June 2015 examination of plaintiff:

> Dr. Bilbrey examined the claimant in June of 2015 at the request of the claimant's attorney. During this examination, the claimant reported that he stopped working after his car accident. Dr. Bilbrey noted that the claimant had adequate immediate, remote, and recent memory. Dr. Bilbrey noted that the claimant did not appear to have problems concentrating. IQ testing done during the exam showed that the claimant's full scale IQ was 63. Dr. Bilbrey did not consider the score as valid. As for his activities of daily living, the claimant reported that he prepared simple meals and that he did some household chores. The claimant also reported that he had friends who visited with him. Dr. Bilbrey assessed the claimant with a math and reading disorder. Dr. Bilbrey concluded that the claimant had slight limits in social interactions; moderate limits in concentration; and that the claimant would miss 3 days a month of work. (Exhibit 12F) The undersigned finds that there is no evidence to support the limitation that the claimant would miss 3 days of work per month for treatment. The claimant admitted that he does not currently receive any mental health treatment and he apparently has never had any mental health treatment. There appears to be no substantive basis for the choice of 3 days per month based on mental and/or physical limitations.

(Doc. 10, p. 30)

Notwithstanding plaintiff's insistence to the contrary, Dr. Bilbrey is not a treating physician for the same reasons explained above at pp. 15-16 in the context of Dr. Cox. There is no evidence that Dr. Bilbrey had a treating relationship with plaintiff, and Dr. Bilbrey's report made it quite clear that plaintiff presented for the assessment at his attorney's request – after the June 24, 2015 hearing – to support plaintiff's application for benefits. Because Dr. Bilbrey is not a treating physician, his opinion was not entitled to controlling weight, nor was the ALJ required to provide "good reasons" for discounting that opinion, only that his reasoning is sufficiently for those on subsequent review to follow.

A careful reading of Dr. Bilbrey's report, summarized above at pp. 4-5, also shows that there is absolutely nothing in the report itself that goes to the question of attendance nor, apart from checking corresponding blank, is there anything in the MSS that would support Dr. Bilbrey's opinion that plaintiff would miss work more than three days a week due to mental impairments or treatments. In short, the ALJ's observation that there was no evidence to support Dr. Bilbrey's opinion that plaintiff would miss more than three days a month is spot on.[11]

Finally, plaintiff asserts that the ALJ "failed to consider the ultimate medical findings" with respect to Dr. Galbraith's examination. (Doc. 16, p. 25 of 26)(underline and unnecessary capitalization omitted) More particularly, plaintiff argues that:

> The ALJ in his Opinion did not address most of Dr. Galbraith's medical conclusions but rather focuses on statements made by Plaintiff to Dr. Galbraith including that he was able to prepare simple meals, and did chores like washing the dishes, doing laundry, and vacuuming and that he attended church. Plaintiff's actual restrictions and medical diagnosis should have been the ALJ's primary focus and not whether Plaintiff is driven to church by his parents on occasion.

(Doc. 16, p. 25 of 26) The ALJ's treatment of Dr. Galbraith's report is quoted below in relevant part

> Dr. Galbraith examined the claimant in September of 2013. . . . Dr. Galbraith noted that the claimant was oriented and that he maintained good eye contact. During the mental status exam, the claimant completed backward serial threes counting on his fingers; he could not spell <u>world</u> backward but he spelled his own name backward; and he recalled 2 out of 3 objects after a brief delay. The claimant showed poor use of basic vocabulary and math skills, and he showed a poor ability for abstract thinking. Dr. Galbraith concluded that the claimant fell into the borderline intellectual range although she did not do any formal IQ testing. The claimant reported that he left his

---

[11] If, on the other hand, Dr. Bilbrey's opinion that plaintiff would miss more than three days a week was based on plaintiff's physical limitations or treatments, then the ALJ was justified in discounting Dr. Bilbrey's opinion because it "related to a matter outside his area of expertise." *See Gant v. Comm'r of Soc. Sec.*, 372 Fed.Appx. 582, 584-85 (6th Cir. 2010); *Adams v. Massanari*, 55 Fed.Appx. 279, 284 (6th Cir. 2003).

last job because he had to take over the farm work due to his father being ill with cancer. **As for his activities of daily living, the claimant reported that he prepared simple meals, that he did chores like washing dishes, doing laundry, and vacuuming, and that he attended church.** Based on the exam, Dr. Galbraith assessed the claimant with an adjustment disorder. Dr. Galbraith concluded that the claimant had moderate limits in concentration, social interaction, and adaptation. . . . The undersigned finds that the claimant is not as limited in social interaction because . . . he reported attending church and that he reported during the exam with Dr. Bilbrey that he had friends. The undersigned gives the remaining opinion some weight.

(Doc. 10, p. 29)(underline in the original, bold added)

Notwithstanding plaintiff's argument to the contrary, the excerpts from the ALJ's decision quoted above show that the ALJ represented Dr. Galbraith's report accurately. The text in bold above is the only part of the ALJ's decision to which plaintiff makes specific reference in his argument. As shown above, plaintiff's assertion that the ALJ "focuse[d] on [these] statements" is frivolous, as is his argument that the ALJ's "focus" was on "whether Plaintiff [wa]s driven to church by his parents on occasion." Indeed, the ALJ makes no reference to plaintiff's parents driving him to church on occasion, or otherwise.[12]

Notwithstanding plaintiff's mischaracterization of the ALJ's focus, substantial evidence supports the ALJ's treatment of Dr. Galbraith's report. First, as noted above at p. 3, Dr. Galbraith's report was based solely on plaintiff's subjective representations during the clinical interview, and the adult function report completed by plaintiff's mother. As previously established above, the ALJ was not required to accept plaintiff's subjective claims or documentary evidence of questionable validity. Second, Dr. Schoup, who reviewed Dr. Galbraith's report as part of his on-the-record

_____

[12] Counsel is cautioned that credibility is hard won and easily lost. Presenting obviously frivolous arguments diminishes counsel's credibility. Once lost, credibility is not easily re-won.

assessment, determined that plaintiff could: 1) "understand and remember . . . low level detailed tasks"; 2) "maintain [concentration, performance, and persistence] for low level detailed tasks"; 3) "interact with the public on [an] occasional basis," but was not otherwise significantly limited in his social interaction with others; 4) "adapt to gradual change." (Doc. 10, pp. 120-221) Finally, Dr. Bilbrey who also examined plaintiff one year and nine-plus months after Dr. Galbraith examined plaintiff, opined in the context of intellectual functioning that plaintiff's low scores did not "accurately present . . . [his] . . . level of functioning," noting further that plaintiff was "definitely not mentally deficient, and his true level of intellectual functioning is estimated to be in the Low Average Range." (Doc. 10, p. 392) Dr. Bilbrey also opined that plaintiff had only slight limitations in short term functioning (Doc. 10, pp. 400-01), "did not have any difficulty concentrating" (Doc. 10, pp. 391-92), his immediate, recent, and remote memory all were "adequate" (Doc. 10, p. 391); and he had only "slight" limitations in both his social relations and adaptability to change (Doc. 10, pp. 392, 400, 402)

As shown above, the ALJ adequately represented his assessment of Dr. Galbraith's report in his decision. Moreover, the opinions of Drs. Schoup and Bilbrey provided substantial evidence in support of the ALJ's treatment of Dr. Galbraith's opinion.

Plaintiff's third claim of error is without merit for the reasons explained above.

### IV. CONCLUSION
### AND
### RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 15) be **DENIED** and the Commissioner's decision be **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall

respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 149, 155, *reh'g denied*, 474 U.S. 111 (1986); *see Berry v. Warden, Southern Ohio Correctional Facility*, 872 F.3d 329, 335 (6th Cir. 2017).

**ENTERED** this 9th day of January, 2018.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge